IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

PEABODY HOLDING COMPANY, LLC, )
  et al., )
                          )
        Plaintiffs, )
                          )
    v. )      1:13cv458 (LMB/IDD)
                          )
UNITED MINE WORKERS OF AMERICA, )
  INTERNATIONAL UNION, )
                          )
        Defendant. )

### MEMORANDUM OPINION

Before the Court are plaintiffs' Motion for Summary Judgment and defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment.  For the reasons that follow, plaintiffs' Motion will be denied, as will defendant's Motion to Dismiss; however, defendant's Motion for Summary Judgment will be granted.

### I.   BACKGROUND

Only a brief recitation of the facts is required in this opinion, as they have already been extensively discussed in two previous opinions.  See generally Peabody Holding Co., LLC v. United Mine Works of Am., No. 1:09cv1043, 2010 WL 3564274 (E.D. Va. Sept. 7, 2010), aff'd sub nom., Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96 (4th Cir. 2012).  Plaintiffs Peabody Holding Company, LLC ("PHC") and Black Beauty Coal Company, LLC ("Black Beauty") are mining

companies, the latter a subsidiary of the former.  Both
companies are ultimately owned by Peabody Energy Corporation
("PE"), which at one point owned several other mining companies
that operated in the eastern United States, including Peabody
Coal Company ("PCC").  Defendant United Mine Workers of America
(the "UMWA" or "Union") is a labor organization whose members
were employed by plaintiffs.

In January 2007, PCC entered into a labor agreement with
the Union on behalf of itself (as a "signatory" company) and as
a limited agent of its immediate parent, PHC, and fellow
subsidiaries (all "nonsignatory" companies), Black Beauty among
them.  The agreement, known generally as the National Bituminous
Coal Wage Agreement ("NBCWA" or "Wage Agreement"), included a
Memorandum of Understanding Regarding Job Opportunities ("2007
MOU").[1]  The purpose of the 2007 MOU was to "provide job
opportunities for work of a classified nature to certain laid-
off and active miners" by requiring nonunion mining companies
within PHC's corporate family to offer three out of every five
new classified job openings to miners who were either working
for or laid off by PCC, the signatory employer.  The 2007 MOU
applied only to "existing, new, or newly acquired nonsignatory

---

[1] The NBCWA was first negotiated in 1993 between the Union and
the Bituminous Coal Operators' Association, Inc., a multi-
employer bargaining group.  The NBCWA was subsequently renewed
at five-year intervals.

bituminous coal mining operations of the nonsignatory [c]ompanies," and it "[did] not constitute a covenant running with the land and [did] not apply to the sale of nonsignatory coal lands, coal reserves or coal operations (either asset sales or stock sales) of the non-signatory [c]ompanies." Moreover, nothing in the 2007 MOU "encumber[ed] or limit[ed] in any way the rights of the nonsignatory [c]ompanies to sell, exchange, release, or otherwise similarly convey . . . any of their nonsignatory coal lands, coal reserves or coal operations to third parties." The parties agreed that their obligations under the 2007 MOU would terminate at 11:59 p.m. on December 31, 2011.

Importantly for present purposes, the 2007 MOU also contained an arbitration clause, which extended dispute-resolution authority to a "Jobs Monitor":

> In order to effectuate the implementation of these job opportunity provisions, the [Union] and the non-signatory [c]ompanies subject to this [MOU] agree that the impartial Jobs Monitor . . . shall serve as the monitor under this [MOU]. The monitor shall review the job selections pursuant to these provisions and investigate any alleged violations herein. The monitor shall have the authority to request such information which may be reasonably necessary in order to secure compliance with the job selection provisions. The parties have the obligation to comply with such requests.

The Jobs Monitor's decisions were to be "final and binding on all parties" subject to the limitation that the Jobs Monitor

could not "alter, amend, modify, add to or subtract from, or change in any way the provisions" of the contract.

In October 2007, less than a year after the parties had renewed the NBCWA and accompanying MOU, PE initiated a significant spinoff of its mining operations in the eastern United States.  The spinoff gave birth to a new publicly-traded entity, Patriot Coal Corporation ("Patriot"), which gained control over PCC and the rest of PHC's former subsidiaries, with the notable exception of Black Beauty.  In addition to retaining ownership of Black Beauty,[2] PE also remained the parent company of PHC.  As a result, PHC and Black Beauty have not had any common ownership or operational connection to PCC or to any other Patriot-owned entity since the spinoff.[3]  PCC thereafter entered into a substantively identical job-preference agreement with the Union as a limited agent of Patriot, which agreed to be bound by its terms going forward.

In early 2008, Black Beauty contracted with a private mine operator, United Minerals, LLC ("United Minerals"), to conduct surface mining operations at its property located in Warrick

---

[2] Following the spinoff, Black Beauty was renamed "Peabody Midwest Mining, LLC."  In the interest of clarity, the Court will continue to refer to the company by its erstwhile name, as the parties have done in their papers.

[3] PCC was also renamed, and it now operates as "Heritage Coal." As above, however, the Court will refer to the company by the name it used when the agreement between the parties was signed.

County, Indiana.  (United Minerals has no ownership relationship
to PCC or any of the other Patriot companies.)  In November
2008, the Union wrote to PE to state its expectation that PHC
and Black Beauty would continue to comply with the 2007 MOU.
Specifically, the Union directed both companies to "make the
requisite job offers" to PCC's classified employees, "keep the
Union informed of such mining operations as they develop," and
"give the required notice of the job selection process to the
Jobs Monitor."  The companies responded that "once the
prerequisite corporate relationship between PHC and PCC was
severed (as of October 31, 2007), obligations under the Jobs MOU
also were severed.  An obligation to secure job opportunities
for UMWA members . . . does not survive conveyance of the UMWA-
represented subsidiary to a third party such as Patriot Coal
Company."  The parties' opposing views of their post-spinoff
obligations form the core of this litigation.

Disputing the assertion that PHC and Black Beauty were no
longer bound by the 2007 MOU, the Union submitted its grievance
to the Jobs Monitor.  Each of the parties provided the Jobs
Monitor with materials supporting their respective arguments,
though PHC and Black Beauty maintained that they did not "accept
or acquiesce to consideration by the Job [sic] Monitor of claims
asserted under the [2007 MOU], as that instrument no longer

applie[d]" to them.   After ruling that the parties had agreed to
arbitrate arbitrability under the 2007 MOU, the Jobs Monitor
found that the dispute was arbitrable but deferred a final
resolution on the merits until further argument could take
place.

PHC and Black Beauty responded by filing a declaratory
judgment action before this Court, in which they asked for a
declaration that the Union's claim was not arbitrable.   The
Union, for its part, filed a counterclaim seeking a declaration
that the Jobs Monitor's decision was enforceable and that the
companies must comply with the decision and proceed to a hearing
on the merits.   The Court entered judgment in favor of the
Union, holding that the Jobs Monitor properly determined the
arbitrability of the dispute.   Peabody, 2010 WL 3564274, at *5-
*6.   The Court further held that the dispute was arbitrable in
any event — that is, even if the arbitrator lacked authority to
decide the question.   Id. at *6.

PHC and Black Beauty appealed, and the Fourth Circuit
affirmed on the ultimate question of arbitrability.   Peabody,
665 F.3d 96.   Although the Fourth Circuit determined that a
federal court, not the Jobs Monitor, was required to decide the
arbitrability question, it independently held that PHC and Black
Beauty could not rebut the ordinary presumption in favor of

6

arbitrability. Id. at 105-07. The Fourth Circuit then ordered the parties to proceed to arbitration on the merits question.

Back before the Jobs Monitor, the parties agreed to bifurcate the arbitration proceedings, "treating in [the first stage] solely the question of whether PHC and Black Beauty continued to be bound by the MOU after the October 31, 2007, spinoff." In the event that the Union prevailed on that question, and the parties subsequently failed to agree on an appropriate remedy, the Jobs Monitor would "resol[ve] the remedy issue" in the second stage.

On January 18, 2013, the Jobs Monitor issued the disputed Arbitration Award (the "Award"). In it, he concluded that "[t]he absence of common ownership between PCC, the signatory employer to the [2007 MOU], and PHC/Black Beauty, the nonsignatory employers bound by the MOU, subsequent to PE's October 31, 2007, spinoff of PCC, did not terminate the obligations of PHC/Black Beauty under the MOU." In other words, the Jobs Monitor concluded that PHC and Black Beauty were still required to abide by the job-preference term notwithstanding the intervening change in corporate relationships. The Jobs Monitor made three findings essential to this conclusion. First, he found that "there [had] been no bona fide sale of either PHC or Black Beauty, the nonsignatory subsidiaries of PE, to an

unrelated third party," which would free them of their
obligations under the terms of the 2007 MOU.  Second, he found
that "requiring PHC/Black Beauty to offer hiring preferences to
the employees of PCC" would not violate federal labor law,
regardless of the lack of common ownership.  Finally, he found
it irrelevant that PCC and the Union had entered into different
(substantively identical) wage and job-preference agreements
following the spinoff, by which time PCC was acting as limited
agent of Patriot, and did not purport to bind either PHC or
Black Beauty.

The Jobs Monitor declined to rule on one issue raised by
PHC and Black Beauty under the 2007 MOU, which amounts to
something of an affirmative defense.  Specifically, he reserved
"[t]he question of whether Black Beauty is exempt from the MOU
by virtue of" a grandfather clause applicable to United
Minerals "until the remedy stage of the proceedings."  He did so
because the question "presents a factual issue that has not been
treated in these proceedings."  Assuming plaintiffs are not
exempt, the Jobs Monitor noted that he would "retain
jurisdiction over this matter for the limited purpose of
resolving any remedial issues on which the parties cannot
agree."

Plaintiffs filed the instant action seeking to vacate the Award as to their liability under the 2007 MOU.

## II.   DISCUSSION

Defendant has moved to dismiss the Complaint as premature and, in the alternative, for summary judgment, asking the Court to enforce the Award and compel plaintiffs to complete the arbitration process.  Plaintiffs have simultaneously moved for summary judgment, asking the Court to vacate the Award or declare it void and unenforceable, as applied, under federal labor law.

### A. Defendant's Motion to Dismiss

Defendant moves to dismiss the Complaint on the grounds that the Court "lacks jurisdiction" over this action because it is "premature" and presents claims "not yet ripe for review." Ostensibly, its motion is brought under Fed. R. Civ. P. 12(b)(1), pursuant to which a court must dismiss an action if it finds subject-matter jurisdiction lacking.  Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006).  The burden of proof rests with the plaintiff to establish that such jurisdiction exists. Warren v. Sessoms & Rogers, P.A., 676 F.3d 365, 370-71 (4th Cir. 2012).  Defendant's argument, however, does not appear to be properly characterized as "jurisdictional."[4]  Instead, its

---

[4] That is, defendant has failed to clearly explain how the lack of a final award in this instance would actually deprive the

9

argument appears more appropriate for resolution under Fed. R.
Civ. P. 12(b)(6), pursuant to which a court must assume the
facts alleged in the complaint are true and must draw all
reasonable inferences in the plaintiff's favor.  Burbach Broad.
Co. of Del. v. Elkins Radio Corp., 278, F.3d 401, 406 (4th Cir.
2002).  "Judgment should be entered when the pleadings,
construing the facts in the light most favorable to the non-
moving party, fail to state any cognizable claim for relief."
O'Ryan v. Dehler Mfg. Co., 99 F. Supp. 2d 714, 718 (E.D. Va.
2000).  The defendant must show that the factual allegations in
the complaint, taken as true, are not "enough to raise a right

---

Court of jurisdiction.  Section 301 of the Labor Management
Relations Act of 1947 ("LMRA") confers jurisdiction on district
courts to enforce "contracts between an employer and a labor
organization representing employees in an industry affecting
commerce."  29 U.S.C. § 185(a).  A district court exercises this
jurisdiction when it enforces an award resolving an issue that
an employer and a union have contracted to arbitrate, as well as
when it enters an order directing that the parties proceed to
arbitration consistent with their contractual obligations.
There is some disagreement as to whether Congress simultaneously
limited this jurisdiction to review of final arbitration awards
or merely contemplated judicial application of a prudential rule
where it had already created sweeping jurisdiction over a class
of cases.  Compare Union Switch & Signal Div. Am. Standard Inc.
v. United Elec., Radio & Mach. Workers of Am., 900 F.2d 608, 612
(3d Cir. 1990) (recognizing a prudential "complete arbitration
rule" but concluding that "a final award is not a prerequisite
to the exercise by the district court of the jurisdiction
conferred by § 301"), with El Mundo Broad. Corp. v. United
Steelworkers of Am., AFL-CIO CLC, 116 F.3d 7, 9 (1st Cir. 1997)
("It is essential for the district court's jurisdiction that the
arbitrator's decision was final, not interlocutory.").  The
Court need not weigh in here because the award is final as to
liability and therefore reviewable.

of relief above the speculative level." Bell Atl. Corp. v.
Twombly, 550 U.S. 544, 555 (2007).

Regardless of where the burden rests, the core question
presented by defendant's motion to dismiss is whether the
arbitration award under attack is "final and binding" under
§ 301 of the Labor Management Relations Act of 1947 ("LMRA"), 29
U.S.C. § 185(a).[5] See Gen. Drivers v. Riss & Co., 372 U.S. 517,
519 (1963) (holding that the LMRA permits federal district
courts to enforce "final and binding" arbitration awards issued
pursuant to a collective bargaining agreement). To this end,
defendant invokes the "complete arbitration" rule, pursuant to
which courts must decline to review an arbitration award unless
it was "intended by the arbitrator to be a complete
determination of every issue submitted." Millmen Local 550,
United Bhd. of Carpenters and Joiners of Am., AFL-CIO v. Wells
Exterior Trim, 828 F.2d 1373, 1375 (9th Cir. 1987). Where the
underlying arbitration proceedings have been bifurcated into
separate liability and damages phases, as here, defendant argues
that an award as to liability only is not reviewable because
subsequent issues remain unresolved. Id. at 1376-77. That is,

---

[5] Although labor arbitration is conducted under the LMRA, federal
courts routinely look to the Federal Arbitration Act, 9 U.S.C.
§ 1 et seq., for guidance in interpreting the LMRA. United
Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 40 n.9
(1987).

an award that postpones the damages determination cannot be challenged in federal court because it does not constitute a "final and binding award."  To find otherwise, the argument goes, would "disrupt and delay the arbitration process and could result in piecemeal litigation."  Pub. Serv. Elec. & Gas Co. v. Sys. Council U-2, Int'l Bhd. Of Elec. Workers, AFL-CIO, 703 F.2d 68, 70 (3d Cir. 1983).

The Fourth Circuit, however, has not expressly adopted this approach, nor does this approach reflect the majority view among the other circuits.  Instead, most courts have recognized an exception to the usual rule when confronted by a party seeking a time out for judicial review of an award following the liability phase of bifurcated proceedings, holding that an "arbitr[ation] award with respect to liability [only] is a final award . . . and is therefore subject to review by courts." Providence Journal Co. v. Providence Newspaper Guild, 271 F.3d 16, 19 (1st Cir. 2001) (citations omitted); see also Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280, 283 (2d Cir. 1986) (holding that "an award which finally and definitely disposes of a separate independent claim may be confirmed although it does not dispose of all the claims that were submitted to arbitration").  In other words, a partial award is reviewable under § 301 as long as it resolves at least

12

one distinct phase of bifurcated arbitration proceedings, even if the arbitrator has left the damages question unanswered.

Based on the weight of such authority, the Court concludes that the partial award as to liability is final for purposes of § 301, notwithstanding that the Jobs Monitor "retain[ed] jurisdiction over this matter for the limited purpose of resolving any remedial issues on which the parties cannot agree." It appears quite clear on the face of the Award that the Jobs Monitor fully and finally resolved the separate and independent question of plaintiffs' liability under the 2007 MOU.

This conclusion is consistent with the parties' intent to bifurcate the arbitration proceedings for this very purpose and the Jobs Monitor's understanding that his ruling constituted a partial final award. See Hart Surgical, Inc. v. Ultracision, Inc., 244 F.3d 231, 235 (1st Cir. 2001) (considering both factors in the finality inquiry). Specifically, the parties acknowledge that they arranged to have the Jobs Monitor rule first on liability so that plaintiffs could test their strongest legal theory before the parties incurred the expense of discovery. The Jobs Monitor likewise understood that his ruling would conclusively settle the liability question, leaving only the matter of fashioning an appropriate remedy if plaintiffs did

not prevail.  Clearly, then, both the parties and the Jobs
Monitor agreed that this was a final, if partial, award.  Any
lingering concerns about fostering (or merely condoning)
piecemeal litigation give way to the concrete issues already
decided by the Jobs Monitor, which are plainly ripe for judicial
review.

Because the arbitrator's liability determination is "final"
for purposes of § 301, defendant's motion to dismiss will be
denied, and the Court will proceed to consider the merits.

### B. Cross-Motions for Summary Judgment

Plaintiffs and defendant have filed competing motions for
summary judgment.  Plaintiffs make two main arguments.  First,
they argue that the Award does not draw its essence from the
parties' agreement insofar as the Jobs Monitor erroneously found
that their obligations under the 2007 MOU survived early
termination of PCC's 2007 Wage Agreement, which incorporated the
2007 MOU by reference.  Second, plaintiffs broadly argue that
the 2007 MOU, as interpreted by the Jobs Monitor, may not be
enforced because it violates §§ 8(b) and 8(e) of the National
Labor Relations Act ("NLRA"), 29 U.S.C. § 158.  For its part,
defendant counters both arguments and affirmatively contends
that the Award must be enforced under the deferential standard
of review normally applied to the decision of an arbitrator.

14

The parties concede that these arguments raise pure issues of
law and that there are no material facts in dispute.

### 1.  The Award draws its essence from the agreement

On July 1, 2011, nearly four years after the spinoff but
six months before the 2007 MOU was set to expire, PCC entered
into new (substantively identical) wage and job-preference
agreements with the Union as a limited agent of Patriot and its
nonunion subsidiaries.[6]  Plaintiffs argue that these agreements
"superseded" the 2007 MOU because PCC was the signatory in both
instances.  Accordingly, plaintiffs argue that even if "Black
Beauty [and PHC] remained obligated to make job offers to
[PCC's] employees after the spinoff, that obligation ended July
1, 2011," when the new agreements went into effect, rather than
on December 31, 2011, when the 2007 MOU would otherwise expire.
Plaintiffs presented the same argument to the Jobs Monitor, who
disagreed.  The Jobs Monitor held that the new agreements did
not terminate plaintiffs' hiring obligations under the 2007 MOU.

There is no dispute that the Jobs Monitor's ruling on this
issue falls squarely within the universe of issues committed to
arbitration by the relevant provision of the 2007 MOU.  The
Court's power to review this aspect of the Award is therefore
extremely circumscribed; after all, judicial review of

---

[6] None of PCC's post-spinoff agreements made any explicit
reference to plaintiffs, which remained under the control of PE.

arbitration awards is "among the narrowest known to the law,"
Union Pac. R.R. v. Sheehan, 439 U.S. 89, 91 (1978) (internal
quotation marks and citation omitted), limited to "determin[ing]
only whether the arbitrator did his job — not whether he did it
well, correctly, or reasonably, but simply whether he did it."
Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,
76 F.3d 606, 608 (4th Cir. 1996).  Indeed, "as long as the
arbitrator is even arguably construing or applying the contract
and acting within the scope of his authority, that a court is
convinced he committed serious error does not suffice to
overturn his decision."  Misco, 484 U.S. at 38.  Such deference
serves as a bulwark against any erosion of the clear federal
policy in favor of settling labor disputes by arbitration.  See
United Steelworkers of Am. v. Enter. Wheel & Car Corp., 363 U.S.
593, 596 (1960).  Without it, "judicial second-guessing . . .
would transform a binding process into a purely advisory one,
and ultimately impair the value of arbitration for labor and
management alike."  Westvaco Corp. v. United Paperworkers Int'l
Union, 171 F.3d 971, 974 (4th Cir. 1999) (internal quotation
marks and citation omitted).

    None of this is to say that an arbitrator has carte blanche
to "dispense his own brand of industrial justice."  Enter.
Wheel, 363 U.S. at 597.  Rather, "an arbitrator is confined to

interpretation and application of the collective bargaining agreement." Id. "[H]is award is legitimate only so long as it draws its essence from the [parties'] agreement." Id. The requirement that the award "draw its essence" from the parties' agreement means that "[t]he arbitrator may not ignore the plain language of the contract." Misco, 484 U.S. at 38. When the arbitrator does so, it can be said that the arbitrator has simply failed to do his job. See Mountaineer Gas, 76 F.3d at 610.

Applying this overwhelmingly deferential standard here, plaintiffs' argument that the Award must be vacated is doomed to fail. The Jobs Monitor explicitly addressed the claim in question, as was his job under the arbitration provision, and he found in favor of defendant. See id. at 608. Plaintiffs take issue instead with the Jobs Monitor's reasoning. They point out that he seemed to believe that PCC, acting on behalf of Patriot, had entered into new agreements with defendant on two different occasions — immediately following the spinoff and again in July 2011. The Jobs Monitor then justified his conclusion by explaining that it was at least ambiguous whether the 2011 agreements terminated the immediate post-spinoff agreements or the 2007 MOU. Plaintiffs counter that the 2011 agreements were the only ones entered into on behalf of Patriot, and that they

17

necessarily terminated the 2007 MOU as a result.  No matter how persuasive plaintiffs' argument might be, however, it would require the Court to delve into the merits of the Jobs Monitor's decision — exactly what is prohibited under governing law.  See Misco, 484 U.S. at 38 ("[T]hat a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision.").

Likewise, a review of the Award demonstrates that the Jobs Monitor did not "dispense his own brand of industrial justice." Enterprise Wheel, 363 U.S. at 597.  The Award does not clearly contravene the plain language of the 2007 MOU, nor does it offend applicable common law.  To the contrary, basic tenets of agency law hold that principals bound to an agreement, as were plaintiffs by PCC, remain bound regardless of whether their agent subsequently enters into a different agreement on behalf of a different principal.  Accordingly, it is clear that the arbitrator did his job in this instance, and therefore, the Court has no power to vacate any aspect of the Award on the ground that it does not draw its essence from the agreement.

### 2. The 2007 MOU does not violate the NLRA

Plaintiffs also contend that the 2007 MOU, as interpreted by the Jobs Monitor, violates §§ 8(b) and 8(e) of the NLRA because it requires them "to provide hiring preferences to the

18

employees of [PCC], a mining company whose employees are
represented by [defendant], even though [plaintiffs] are not
party to a collective bargaining agreement with [defendant] and
share no common ownership with [PCC]." Plaintiffs have made
this point at every juncture of their ongoing dispute with
defendant, including before the Jobs Monitor, to no avail.
Because federal courts have "a duty to determine whether a
[labor] contract violates federal law before enforcing it,"
Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 83 (1982), the
issues raised by plaintiffs are "the type of [issues]" that this
Court must "decide and review de novo," Marrowbone Dev. Co. v.
Dist. 17, United Mine Workers of Am., 147 F.3d 296, 300 (4th
Cir. 1998) (citations omitted), notwithstanding the great
deference normally afforded an arbitrator's decision.

### a. Sections 8(b)(1)(A) and 8(b)(2)

Plaintiffs argue that post-spinoff enforcement of the 2007
MOU would require them to offer jobs to PCC employees solely on
the basis of the latter's union membership, in violation of
§§ 8(b)(1)(A) and (b)(2) of the NLRA, which generally make it
unlawful for employers to grant hiring preferences on such a
basis. See 29 U.S.C. §§ 158(b)(1)(A), (b)(2). Specifically,
plaintiffs argue that the spinoff cut them out of the
multiemployer bargaining unit that entered into the 2007 MOU,

19

leaving union membership, as opposed to seniority with a related
subsidiary, as the sole factor in granting hiring preferences.

At core, plaintiff's argument is incompatible with the Jobs
Monitor's ruling that their obligations under the 2007 MOU
survived the spinoff, a ruling this Court will not overturn for
the reasons stated above.  Plaintiffs' argument is also flatly
contradicted by the record.  For starters, the 2007 MOU
expressly prohibits "dicriminat[ion] against any person on the
basis of union membership or the lack thereof."  This
prohibition is fully consistent with the ultimate objective of
the agreement, which is not merely to reward union membership,
but to provide the nonsignatory mining companies with access to
an experienced pool of miners.  Accordingly, it is seniority
achieved through work with PCC, the signatory company, rather
than membership in the Union per se, that entitles miners in the
bargaining unit to job opportunities at nonsignatory companies.
It follows that the benefit of the job-preference term accrues
to individual miners.  That is, PCC miners are given job
opportunities irrespective of their status within the Union, and
those that accept jobs have no Union representation while
working for a nonunion company.  See Courier-Citizen Co. v.
Boston Electrotypers Union No. 11, Int'l Printing & Graphic
Commc'ns Union of N. Am., 702 F.2d 273, 278 (1st Cir. 1983).  As

20

the Jobs Monitor correctly observed, plaintiffs have failed to cite any on-point case law to the contrary.

In sum, the Court independently concludes that post-spinoff enforcement of the 2007 MOU against plaintiffs does not run afoul of §§ 8(b)(1)(A) or (8)(b)(2) of the NLRA.

### b. Section 8(e)

The more difficult issue is whether post-spinoff enforcement of the 2007 MOU against plaintiffs violates § 8(e) of the NLRA, which generally prohibits labor agreements that encumber or otherwise restrict the manner in which neutral employers conduct business. See 29 U.S.C. § 158(e). Plaintiffs argue that the 2007 MOU is no longer a permissible agreement designed to preserve bargaining unit work because it now reaches out and affects the labor relations of neutral employers not controlled by PCC, either by forcing plaintiffs themselves to provide job preferences or to cease doing business with third party contractors which do not provide such preferences. The critical point being, once again, that severance of plaintiffs' corporate relationship with PCC rendered plaintiffs neutral employers by ending their obligations under the 2007 MOU.

It is useful at this juncture to consider the backdrop against which plaintiffs make their argument. No party disputes that plaintiffs were initially bound to the terms of the 2007

MOU by PCC, which signed the agreement in its capacity as
plaintiffs' agent, as well as in its own right.  An agent
authorized to act on behalf of a principal can, of course,
create contractual obligations between the principal and a third
party.  Moreover, those obligations persist without any regard
to subsequent changes in the relationship between the agent and
the principal, including in the context of a labor agreement.
See EPE, Inc. v. N.L.R.B., 845 F.2d 483, 487 (4th Cir. 1988)
("Obviously, a continuing unchanged employer remains bound by
its obligations, including a collective bargaining agreement,
just as any corporation remains bound by contracts into which it
enters."); see also N.L.R.B. v. Rockwood Energy & Mineral Corp.,
942 F.2d 169, 173 (3d Cir. 1991) ("A stock sale does not absolve
a corporate entity from labor obligations which accrued prior to
the sale.").  Because plaintiffs agree that PCC had authority to
bind them to the 2007 MOU, which was lawful at the time, it is
clear that they remained bound unless some other source of law
displaced the contract.

     Plaintiffs direct the Court to § 8(e), which provides that
"[i]t shall be an unfair labor practice for any labor
organization and any employer to enter into any contract or
agreement . . . whereby such employer . . . agrees . . . to
cease doing business with any other person."  29 U.S.C.

§ 158(e).  Especially relevant here, this provision covers
situations in which a primary employer, fulfilling its
obligations under a labor agreement, must "exert[] any pressure
calculated to cause a significant change or disruption of [a]
neutral employer's mode of business."  Sheet Metal Workers,
Local Union No. 91 v. N.L.R.B., 905 F.2d 417, 421 (D.C. Cir.
1990) (citations omitted).  In either event, Congress has sought
to insulate neutral employers from "union pressure . . . the
object of which [is] to induce or coerce [the neutral employers]
to cease doing business with an employer with whom the union
[is] engaged in a labor dispute."  Nat'l Woodwork Mfrs. Ass'n v.
N.L.R.B., 386 U.S. 612, 621-22 (1967).

For purposes of § 8(e), labor agreements are thus
considered either "primary" or "secondary," the former being
permissible while the latter are not.  N.L.R.B. v. Int'l
Longshoremen's Ass'n, AFL-CIO, 473 U.S. 61, 78-79 (1985)
(hereinafter "ILA II").  "The touchstone is whether the
agreement or its maintenance is addressed to the labor relations
of the contracting employer vis-à-vis his own employees," Nat'l
Woodwork, 386 U.S. at 645, that is, whether the agreement's
"object . . . is to benefit the employees of the bargaining unit
represented by the union" rather than apply pressure to "a[]
[neutral] employer in order to require [it] to accede to union

23

objectives[.]" A. Duie Pyle, Inc. v. N.L.R.B., 383 F.2d 772, 776 (3d Cir. 1967).

One type of primary agreement presumptively permissible under § 8(e) is a "work preservation agreement," which is an agreement that "reserves to a union's members the jobs that they have historically performed." Local 917, Int'l Bhd. of Teamsters v. N.L.R.B., 577 F.3d 70, 76 (2d Cir. 2009) (quoting ILA II, 473 U.S. at 78-79). To qualify, the agreement in question must satisfy two criteria: it must be (1) calibrated to preserve the work traditionally performed by union-represented employees in the bargaining unit, as well as (2) directed at work over which the signatory employer has a right of control. N.L.R.B. v. Int'l Longshoremen's Ass'n, AFL-CIO, 447 U.S. 490, 504-05 (1980) (hereinafter "ILA I").

The first criterion is largely a matter of intent. See Becker Elec. Co. v. Int'l Bhd. of Elec. Workers, Local Union No. 212 AFL-CIO, 927 F.2d 895, 898 (6th Cir. 1991). There can be no dispute that defendant bargained for the 2007 MOU "with the object of work preservation in the face of a genuine job threat" in the absence of any record evidence that defendant intended to apply pressure to some then-unknown neutral employer. ILA II, 473 U.S. at 79 n.19. Plaintiffs appear to concede as much but argue that the spinoff worked a material change on this point.

24

Subsequent corporate developments, unforeseeable at the time of negotiation, do not provide a sufficient basis to retroactively impute improper motives to a party in defendant's position.  In other words, it would not be reasonable to fault defendant for seeking work for its members at plaintiffs' mines when both were a party to the resulting labor agreement, and defendant had no way of anticipating their eventual conscious uncoupling from the multiemployer bargaining unit.  Regardless of the ultimate consequences, all of the evidence shows that defendant's efforts were in service of valid work preservation objectives at the relevant time.  See 29 U.S.C. § 158(e) (measuring lawfulness at the time "any labor organization and any employer . . . enter into any contract or agreement").

Nor does post-spinoff "maintenance" of the 2007 MOU against plaintiffs take on an acquisitive character.  See Nat'l Woodwork, 386 U.S. at 645.  Requiring plaintiffs to continue providing notice of classified job openings to miners employed or laid off by PCC before the spinoff, which is all defendant demands, merely ensures that the benefits accruing to those miners in the bargaining unit remain unchanged.  The jobs at issue are the very same ones traditionally performed by the very same miners to whom plaintiffs had been providing notice in the years before the spinoff.  Accordingly, the Jobs Monitor's

interpretation of the 2007 MOU does not impermissibly extend it beyond the bargaining unit.  Cf. Local 32B-32J, Serv. Employees Int'l Union v. N.L.R.B., 68 F.3d 490, 495 (D.C. Cir. 1995) (holding that an agreement which, as applied, would "extend the contract to reach outside the contractual bargaining unit" violates § 8(e)).

It is true that post-spinoff enforcement of the 2007 MOU will necessarily diminish employment opportunities for nonunion miners at PHC, Black Beauty, and any companies with which they contract.  Even so, the Supreme Court has clearly stated that an otherwise-valid work preservation agreement does not contravene § 8(e) just because a neutral employer's mode of business is to some degree affected.  Nat'l Woodwork, 386 U.S. at 627, 640.  An agreement's impact "on the employment opportunities of [nonunion employees], no matter how severe, is . . . irrelevant to the validity of the agreement."  ILA I, 447 U.S. at 507 n.22.  The decisive element is intent, see Becker Elec., 927 F.2d at 898, and defendant's intent was to preserve work for its members, an objective complicated only by the unilateral actions of the bargaining employers.  The 2007 MOU, as interpreted by the Jobs Monitor, thus satisfies the first criterion.

The threshold question under the second criterion is whether PCC, as the signatory employer, maintained a "right of

control" over jobs at PHC and Black Beauty throughout the term

of the 2007 MOU.  See ILA I, 447 U.S. at 504-05.  Of course, PCC

lost any measure of actual control when it was spun off to

Patriot, thereby severing its corporate relationship with

plaintiffs.  Although that fact would seem to end the inquiry,

the Supreme Court has cautioned against "mechanical application"

of the right-of-control test.  N.L.R.B. v. Enter. Ass'n of

Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach.

& Gen. Pipefitters of N.Y. & Vicinity, Local Union No. 638, 429

U.S. 507, 521 n.8 (1977).  Instead, equity must be considered

because "only an unoffending, neutral employer can effectively

disclaim control.  An employer may not engage in affirmative

conduct that it reasonably concludes would conflict with its

collective-bargaining obligations."  Local 917, 577 F.3d at 76

(internal quotation marks, alterations, and citations omitted);

see also Int'l Bhd. of Elec. Workers, Local Union No. 501, AFL-

CIO v. N.L.R.B., 566 F.2d 348, 352 (D.C. Cir. 1977) (holding

that only an unoffending employer is entitled to protection

under the NLRA).  The unoffending employer determination finds

support in decisions of the National Labor Relations Board:

> [W]e have studied and shall continue to study not only
> the situation the pressured employer finds himself in
> but also how he came to be in that situation.  And if
> we find that the employer is not truly an "unoffending
> employer" who merits the Act's protections, we shall
> find no violation in a union's pressures . . . .

Local Union No. 438, United Ass'n of Journeymen and Apprentices
(George Koch Sons, Inc.), 201 N.L.R.B. 59, 64, enforced, George
Koch Sons, Inc. v. N.L.R.B., 490 F.2d 323 (4th Cir. 1973).

Here, plaintiffs cannot be considered unoffending employers
— and thus entitled to shelter under § 8(e) — because PCC only
relinquished its right of control over jobs at PHC and Black
Beauty through the affirmative conduct of their mutual parent,
PE, which decided to spin off PCC and other subsidiaries but not
PHC and Black Beauty.  When the parties entered into the 2007
MOU, PCC had at least a nominal basis for asserting control over
such jobs by dint of its relationship to both plaintiffs as
members of PHC's (and PE's) corporate family.  Only after PE
took the calculated, unilateral step of initiating the spinoff
could plaintiffs plausibly claim to be neutral employers.
Defendant, of course, had nothing to do with the spinoff
decision.  More importantly, the adverse impact on miners in the
bargaining unit was entirely foreseeable to PE when it initiated
the spinoff.  Cf. George Koch Sons, 490 F.2d at 328 ("Certainly
where the employer was initially in a position to accede to
potential union demands through the negotiating stages of the
contract, then he should not later be deemed a neutral if he
intentionally forfeited his potential for control.").  Severing
the corporate relationship between the signatory company (PCC)

28

and at least two nonsignatory companies (PHC and Black Beauty),
when that relationship was declared the glue holding the
multiemployer unit together, posed an obvious conflict with
obligations under the 2007 MOU.  Local 917, F.3d at 77 (citation
omitted).  Plaintiffs cannot now rely on such conduct to excuse
their refusal to provide hiring preferences.

Plaintiffs respond that neither they nor their parent stand
to benefit from refusing to abide by the 2007 MOU because PCC is
a competitor and therefore unlikely to divert work to
plaintiffs.  That response begs the question.  As an equitable
matter, the Court is also concerned that allowing plaintiffs to
evade their obligations would set the stage for employers with
less benign intentions to manipulate the corporate form to the
detriment of the collective bargaining process.  Rather than
perform the difficult task of attempting to scrutinize their
profession of good faith, see Int'l Bhd. of Elec. Workers, 566
F.2d at 353, it is more useful to look to the actual effect of
the disputed conduct, which would be to undermine the bargained
for protections of a valid work preservation agreement.

In the final analysis, the 2007 MOU is a valid agreement
that preserved work for miners in the bargaining unit and was
directed at work over which the signatory company had a right of
control until such control was voluntarily relinquished by the

affirmative conduct of its ultimate parent. Because plaintiffs are offending employers, § 8(e) erects no barriers to post-spinoff enforcement of the 2007 MOU.[7]

### III.   CONCLUSION

For these reasons, defendant's Motion to Dismiss and plaintiffs' Motion for Summary Judgment will be denied, defendant's Motion for Summary Judgment will be granted, and this matter will be remanded to the Jobs Monitor to determine the appropriate damages by an Order to be issued with this Memorandum Opinion.

Entered this 28 day of August, 2014.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[7] Defendant does not seek damages for miners who were hired by PCC at any point after the spinoff, even though the 2007 MOU did not terminate until December 31, 2011.  Instead, defendant merely seeks damages for those PCC miners who were active or laid off before October 31, 2007, the date of the spinoff, because those miners clearly belonged to the original bargaining unit and were familiar to plaintiffs.